

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>         Plaintiff,<br><br>    v.<br><br>CHAD WIEGAND and<br>AKIS ERACLEOUS,<br><br>         Defendants. | Case No. 15cr1462-DMS<br><br>I N F O R M A T I O N<br><br>Title 18, U.S.C., Sec. 371,<br>Conspiracy to Commit Offenses<br>Against the United States<br>(Securities Fraud and Insider<br>Trading); Title 18, U.S.C., Sec.<br>981(a)(1)(C); and Title 28 U.S.C.,<br>Sec. 2461(c) - Criminal Forfeiture |

The United States Attorney charges, at all times material:

Introductory Allegations

Relevant Entities and Individuals

1.   Ardea Biosciences, Inc. ("Ardea") was a biotechnology company headquartered in San Diego, California. Ardea was an "issuer" under federal securities laws, and its shares of common stock were traded on the NASDAQ Stock Market under the ticker symbol "RDEA." Among other things, Ardea was developing drugs dubbed RDEA594, a first-in-class candidate for treatment of hyperuricemia and gout, and RDEA119, a compound for treating malignant tumors.

2. AstraZeneca plc ("AstraZeneca") was a multinational pharmaceutical and biotechnology company headquartered in London, United Kingdom.

3. "CO-CONSPIRATOR #1" was the Senior Director of Information Technology at Ardea. In this position, he oversaw Ardea's entire computer operations infrastructure and had access to information maintained on Ardea's computer system.

4. Defendant Chad WIEGAND was CO-CONSPIRATOR #1's brother-in-law. From approximately 2005-2012, WIEGAND worked as a licensed broker for the firm of National Planning Corporation ("NPC"). At NPC, WIEGAND managed more than a dozen customers and several million dollars' worth of annual trading. WIEGAND's customer accounts were typically discretionary accounts, meaning that WIEGAND managed the funds for his customers and had standing permission to make trades in the accounts on his customers' behalves. WIEGAND earned fees for maintaining and trading in these customer accounts.

5. WIEGAND and CO-CONSPIRATOR #1 previously worked together at the brokerage firm of Chatfield Dean in the 1990s, where they met. In addition to being related, WIEGAND and CO-CONSPIRATOR #1 each considered the other a close personal friend. They socialized frequently and CO-CONSPIRATOR #1 knew that WIEGAND was a single father who struggled financially to support his family. From time to time, CO-CONSPIRATOR #1 provided WIEGAND with money and other consideration to help WIEGAND make ends meet.

6. As a high-level employee of Ardea, CO-CONSPIRATOR #1 knew that he was bound by Ardea's confidentiality policy regarding material, non-public information within and concerning the company ("inside information"). In addition, CO-CONSPIRATOR #1 knew that he

owed a fiduciary duty of trust and confidence directly to Ardea and derivatively to AstraZeneca when, as discussed below, the two companies began discussing a possible merger in 2012. CO-CONSPIRATOR #1 likewise knew that these companies reasonably expected that he would maintain the confidentiality of inside information.

7. Defendant Akis ERACLEOUS worked as a licensed broker at NPC. Like WIEGAND, ERACLEOUS managed customer accounts, including discretionary accounts. ERACLEOUS earned fees for maintaining and trading in his customers' accounts. ERACLEOUS knew that CO-CONSPIRATOR #1 was WIEGAND's brother-in-law, and that CO-CONSPIRATOR #1 was a high-level employee at Ardea.

8. "CO-CONSPIRATOR #2" worked as a licensed broker at NPC. CO-CONSPIRATOR #2 also managed customer accounts, including discretionary accounts and earned fees for maintaining and trading in the accounts. CO-CONSPIRATOR #2 shared some customers with ERACLEOUS at NPC. CO-CONSPIRATOR #2 knew that WIEGAND was related to a high-level employee at Ardea.

9. "CO-CONSPIRATOR #3" was an acquaintance of ERACLEOUS and CO-CONSPIRATOR #2 who maintained personal accounts at various brokerage firms for the purpose of trading securities. CO-CONSPIRATOR #3 knew that WIEGAND was related to a high-level employee at Ardea.

10. "CO-CONSPIRATOR #4" was a shared customer of ERACLEOUS and CO-CONSPIRATOR #2 at NPC, as well as ERACLEOUS's relative. CO-CONSPIRATOR #4 knew that one of ERACLEOUS's colleagues at NPC was connected to a high-level employee at Ardea.

## COUNT 1

### Conspiracy to Commit Securities Fraud (18 U.S.C. § 371)

11. Paragraphs 1-10 are realleged.

12. Beginning no later than March 2009, and continuing to at least April 23, 2012, within the Southern District of California and elsewhere, defendants CHAD WIEGAND and AKIS ERACLEOUS, and CO-CONSPIRATOR #1, CO-CONSPIRATOR #2, CO-CONSPIRATOR #3, and CO-CONSPIRATOR #4, and others known and unknown, did knowingly and intentionally conspire to commit securities fraud, in violation of Title 15, United States Code, Sections 78j and 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2.

<u>The Insider Trading Scheme - Methods and Means of the Conspiracy</u>

13. From March 2009 - April 2012, defendants WIEGAND and ERACLEOUS, and CO-CONSPIRATOR #1, CO-CONSPIRATOR #2, CO-CONSPIRATOR #3, and CO-CONSPIRATOR #4, and others known and unknown (the "conspirators"), participated in a conspiracy by obtaining, sharing, and disclosing material, inside information belonging to Ardea and executing profitable securities transactions on the basis of inside information.

14. In furtherance of the fraudulent conspiracy, the conspirators employed the following methods and means, among others: (1) CO-CONSPIRATOR #1 would obtain inside information; (2) in breach of his duties of trust and confidence owed to Ardea and AstraZeneca, CO-CONSPIRATOR #1 would disclose to WIEGAND the inside information knowing that it was material, non-public information, so that WIEGAND could use it to profit by trading in shares of Ardea; (3) WIEGAND would disclose all and a material part of the inside information to ERACLEOUS knowing that it was material, non-public information, and that CO-CONSPIRATOR #1 had a duty to maintain its confidentiality, so that ERACLEOUS could use it to profit by trading in shares of Ardea; (4) ERACLEOUS disclosed all and a material part of the inside

4

information to CO-CONSPIRATOR #2, CO-CONSPIRATOR #3, and CO-CONSPIRATOR #4, knowing that it was material, non-public information and that CO-CONSPIRATOR #1 had provided it to WIEGAND in violation of his duty to maintain its confidentiality, so that CO-CONSPIRATOR #2, CO-CONSPIRATOR #3, and CO-CONSPIRATOR #4 could use it to profit by trading in shares of Ardea; and (5) WIEGAND, ERACLEOUS, CO-CONSPIRATOR #2, CO-CONSPIRATOR #3, and CO-CONSPIRATOR #4 placed and caused to be placed trades of Ardea securities on the basis of the inside information, each knowing that CO-CONSPIRATOR #1 had disclosed it in violation of his duty to Ardea.

The Bayer Announcement

15.  On or about March 2009, in the course of his work at Ardea, CO-CONSPIRATOR #1 became aware that Ardea would soon publicly announce a global agreement with Bayer HealthCare, LLC (the "Bayer announcement") concerning one of Ardea's products under development. Knowing that the announcement was very likely to have a positive impact on Ardea's stock price, CO-CONSPIRATOR #1 shared the inside information concerning the forthcoming Bayer announcement (the "Bayer inside information") with WIEGAND, so that he could trade on it. WIEGAND in turn shared the Bayer inside information, and a material part of it, with ERACLEOUS, who shared it, and a material part of it, with CO-CONSPIRATOR #2 and CO-CONSPIRATOR #4.

16.  From March 12, 2009 – April 28, 2009, WIEGAND purchased Ardea shares in his customers' accounts in order to capitalize on the Bayer inside information.

17.  From March 20 – April 9, 2009, CO-CONSPIRATOR #2 purchased and caused to be purchased shares of Ardea in accounts in his name and

that of his wife in order to capitalize on the Bayer inside information.

18. From March 19 - March 31, 2009, ERACLEOUS purchased shares of Ardea in his personal brokerage account in order to capitalize on the Bayer inside information.

19. On April 1, 2009, ERACLEOUS and CO-CONSPIRATOR #2 purchased Ardea shares in CO-CONSPIRATOR #4's account, with CO-CONSPIRATOR #4's informed consent, in order to capitalize on the Bayer inside information.

20. On April 27, 2009 - the last day before the Bayer announcement - shares of Ardea stock closed at $11.68.

21. On April 28, 2009, Ardea publicly issued the Bayer announcement, stating that it had entered into a global agreement with Bayer, which focused on a joint program for developing inhibitors for the treatment of tumors, a prominent component of which was RDEA119.

22. On April 28, 2009, following the Bayer announcement, shares of Ardea closed at $13.11, an increase of 12% from the prior day's closing price.

23. Shortly after the Bayer announcement, on April 28, 2009, ERACLEOUS and CO-CONSPIRATOR #2 sold Ardea shares from CO-CONSPIRATOR #4's account, realizing profits of approximately $11,554 as a result of the trades they placed on the basis of the Bayer inside information.

24. On April 29, 2009, CO-CONSPIRATOR #2 sold and caused to be sold Ardea shares from brokerage accounts in his name and that of his wife, realizing profits of approximately $6,983 as a result of the trades he caused to be placed in those accounts on the basis of the Bayer inside information.

25. From April 29 – May 6, 2009, ERACLEOUS sold Ardea shares from his personal brokerage account, realizing profits of approximately $3,374 as a result of the trades he placed on the basis of the Bayer inside information.

26. From April 29 – May 11, 2009, WIEGAND sold Ardea shares from his customers' account, realizing a profit of approximately $21,065 as a result of the trades he placed on the basis of the Bayer inside information.

The RDEA594 Preliminary Announcement

27. On or about November 2009, CO-CONSPIRATOR #1 became aware that Ardea would soon publicly announce positive news regarding RDEA594 (the "RDEA594 preliminary announcement"). Knowing that the announcement was very likely to have a positive impact on Ardea's stock price, CO-CONSPIRATOR #1 shared inside information concerning the forthcoming RDEA594 preliminary announcement (the "RDEA594 inside information") with WIEGAND, so that he could trade on it. WIEGAND in turn shared the RDEA594 inside information, and a material part of it, with ERACLEOUS, who shared it, and a material part of it, with CO-CONSPIRATOR #2 and CO-CONSPIRATOR #4.

28. On November 30, 2009, WIEGAND purchased Ardea shares in a customer's accounts in order to capitalize on the RDEA594 inside information.

29. On November 30, 2009, ERACLEOUS and CO-CONSPIRATOR #2 purchased Ardea shares in CO-CONSPIRATOR #4's accounts, with CO-CONSPIRATOR #4's informed consent, in order to capitalize on the RDEA594 inside information.

30. On November 30, 2009 – the last day before the RDEA594 preliminary announcement – shares of Ardea stock closed at $13.46.

31. On December 1, 2009, Ardea publicly issued the RDEA594 preliminary announcement, in which it disclosed positive data from its preliminary clinical trial program for RDEA594.

32. On December 1, 2009, following the RDEA594 preliminary announcement, shares of Ardea closed at $14.17, an increase of 5% from the prior day's closing price.

33. Shortly after the RDEA594 preliminary announcement on December 4, 2009, WIEGAND sold Ardea shares from his customer's accounts, realizing a profit of approximately $1,796 as a result of the trades he placed on the basis of the RDEA594 preliminary inside information.

34. On March 12, 2010, ERACLEOUS and CO-CONSPIRATOR #2 sold Ardea shares from CO-CONSPIRATOR #4's account, with CO-CONSPIRATOR #4's informed consent, realizing profits of approximately $18,991 as a result of the trades they placed on the basis of the RDEA594 inside information.

<u>The Merger Announcement</u>

35. On or about April 2012, CO-CONSPIRATOR #1 became aware that Ardea would soon publicly announce that it was being acquired by another company (the "merger announcement"). Knowing that the announcement was very likely to have a positive impact on Ardea's stock price, CO-CONSPIRATOR #1 shared the inside information concerning the forthcoming Bayer announcement (the "merger inside information") with WIEGAND, so that he could trade on it. WIEGAND in turn shared the merger inside information, and a material part of it, with ERACLEOUS, who shared it, and a material part of it, with CO-CONSPIRATOR #2, CO-CONSPIRATOR #3, and CO-CONSPIRATOR #4.

36. On April 19, 2012, ERACLEOUS and CO-CONSPIRATOR #2 purchased Ardea options in CO-CONSPIRATOR #4's account, with CO-CONSPIRATOR #4's informed consent, in order to capitalize on the merger inside information.

37. From April 19-20, 2012, WIEGAND purchased Ardea shares in his customers' accounts in order to capitalize on the merger inside information.

38. On April 20, 2012, ERACLEOUS, CO-CONSPIRATOR #2, and CO-CONSPIRATOR #3 agreed that CO-CONSPIRATOR #3 would place trades involving Ardea options in CO-CONSPIRATOR #3's brokerage account for the benefit of ERACLEOUS, CO-CONSPIRATOR #2, and CO-CONSPIRATOR #3, in order to capitalize on the merger inside information. That same day, CO-CONSPIRATOR #3 purchased Ardea options in his brokerage account pursuant to his agreement with ERACLEOUS and CO-CONSPIRATOR #2. By making the trades in CO-CONSPIRATOR #3's account, ERACLEOUS, CO-CONSPIRATOR #2, and CO-CONSPIRATOR #3 sought to conceal the association of ERACLEOUS and CO-CONSPIRATOR #2 with the trade and the fact that the trades have been placed on the basis of the merger inside information.

39. On April 20, 2012 – the last day before the merger announcement – shares of Ardea stock closed at $20.84.

40. On April 23, 2012, Ardea publicly issued the merger announcement, stating that Ardea and AstraZeneca had entered a definitive merger agreement in which AstraZeneca would acquire Ardea.

41. On April 23, 2012, following the merger announcement, shares of Ardea closed at $31.62, an increase of 51.7% from the prior day's closing price.

42. Shortly after the merger announcement, on April 23, 2012, ERACLEOUS and CO-CONSPIRATOR #2 sold Ardea options from CO-CONSPIRATOR #4's account, with CO-CONSPIRATOR #4's informed consent, realizing profits of approximately $162,037 as a result of the trades they placed on the basis of the merger inside information.

43. Shortly after the merger announcement on April 23, 2012, CO-CONSPIRATOR #3 sold Ardea options from his brokerage account, for the benefit of himself, ERACLEOUS, and CO-CONSPIRATOR #2, realizing profits of approximately $83,493 as a result of the trades he placed on the basis of the merger inside information.

44. Shortly after the merger announcement, from April 23 - 24, 2012, WIEGAND sold Ardea shares from his customers' account, realizing a profit of approximately $215,128 as a result of the trades he placed on the basis of the merger inside information.

### Overt Acts

45. In furtherance of the fraudulent conspiracy and scheme and to effect the objects thereof, the following overt acts, among others, were committed within the Southern District of California, and elsewhere:

    a. In or about April 2012, co-conspirator CO-CONSPIRATOR #1 disclosed the merger inside information to defendant CHAD WIEGAND.

    b. In or about April 2012, defendant CHAD WIEGAND disclosed the merger inside information, and a material part of it, to defendant AKIS ERACLEOUS.

    c. In or about April 2012, defendant AKIS ERACLEOUS disclosed the merger inside information, and a material part of it, to CO-CONSPIRATOR #2, CO-CONSPIRATOR #3, and defendant CO-CONSPIRATOR #4.

1        d.  In or about April 20, 2012, CO-CONSPIRATOR #3 placed
2  trades involving Ardea options.
3  All in violation of Title 18, United States Code, Section 371.

### FORFEITURE ALLEGATION

46. Paragraphs 1-45 are realleged.

47. Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), upon conviction of the offense set forth in Count 1 of this Information, defendants CHAD WIEGAND and AKIS ERACLEOUS shall forfeit to the United States of America any property, real or personal, involving in such offense, and any property traceable to such property. The property to be forfeited includes, but is not limited to, the following:

      a.  Brokerage transaction and trading fees accumulated by any defendant as a result of any of the trades discussed in paragraphs 13-44 above.

      b.  Cash received by any defendant in consideration of their role in the conspiracy described in Count 1.

      c.  Gain obtained by any defendant as a result of securities transactions conducted in furtherance of the conspiracy described in Count 1.

48. If any of the property described above, as a result of any act or omission of any defendant, cannot be located upon the exercise of due diligence, has been transferred or sold to, or deposited with, a third party, has been placed beyond the jurisdiction of the court; has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as

incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code Section 2461(c), up to the full amount of forfeitable property described above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

DATED: *June 9*, 2015.

LAURA E. DUFFY
United States Attorney

By: *Robert Huie*
ROBERT S. HUIE
Assistant U.S. Attorney